Filed 3/12/13  P. v. Flemming CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAJUAN FLEMMING,<br><br>        Defendant and Appellant. | A130683<br><br>(Alameda County<br> Super. Ct. No. C162878) |

        This is an appeal from final judgment after a jury convicted defendant Dajuan Flemming of special circumstance first degree murder and attempted premeditated murder with enhancements for personal infliction of great bodily injury, discharge of a firearm from a motor vehicle, and personal use of a firearm.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

        On February 22, 2010, an information was filed charging defendant with the following crimes:  (1) first degree murder with the special circumstance of discharging a firearm from a motor vehicle (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(21))[1] (count one); and (2) attempted premeditated murder (§§ 187, subd. (a), 664, subd. (a)) (count two).  The information further alleged enhancements for personally and intentionally discharging a firearm and inflicting great bodily injury and personally using a firearm with respect to both counts.  (§§ 12022.5, subd. (a), 12022.53, subds. (b)(c)(d)(g) and 12022.7 subd. (a).)  As to count one only, the information added a second-degree drive-

_____

[1]        Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

by murder clause, whereby it was further alleged defendant perpetrated the offense in count one by means of shooting a firearm from a motor vehicle with intent to inflict great bodily injury. (§ 190, subd. (d).)

Trial began October 14, 2010, at which the prosecution presented the following evidence.[2]

## I. The Prosecution's Case.

On March 25, 2009, defendant, then 18 years old, was visiting the Oakland home of his cousin, Raul Toscano Jr., and his uncle, Raul Toscana Sr., on Sycamore Street between West Street and Martin Luther King Junior Way. Defendant lived in Richmond with his parents and siblings, and had driven to Oakland in his 1992 Blue Chevrolet Van.[3] That evening, while defendant and several others were socializing in the front yard, they were fired upon by unidentified persons driving by in a car. Defendant's uncle, cousin, and another person were injured. Defendant took his uncle to a nearby hospital in his van, while defendant's friend, Tyree Jackson, took the other two injured people in his black Cadillac. When interviewed by police shortly after this drive-by shooting, defendant refused to provide any information about the shooter or the car. However, when interviewed again after the crimes in question, which occurred two days later on March 27, 2009, defendant told police the shooter had been a passenger in a red two-door Ford Mustang with an undersized spare tire on the right rear side.

In March 2009, 25-year-old Giovanna Warren was renting a red two-door Ford Mustang with an undersized spare tire on the right rear side. However, on March 25, 2009, Warren did not have the Mustang because her boyfriend, Laron, had taken it during an argument, leaving her stranded at her aunt's home until about 10:00 p.m., when she went to the Oakland apartment of her friend, Decontee Bility, still angry about not having

---

[2]    The defense rested after the prosecution's case without presenting any further evidence.

[3]    Defendant's daughter also lived in Oakland with her mother, Shakiyla Black.

2

the car.  Warren had been staying at Bility's apartment since recently being evicted from her home.

Warren later got the Mustang back from Laron, driving it at about 11:00 a.m. on March 27, 2009 to pick up her sister, Sylvia Warren, and then returning to Bility's apartment.  There, Giovanna Warren and Bility began drinking gin and talking.  Warren was upset about her boyfriend and money issues.  Around 3:00 or 3:30 p.m., Sylvia (who was pregnant and did not drink gin) drove the Mustang to retrieve her daughter from Hoover Elementary School.  After Sylvia returned to Bility's apartment, Warren and Bility then took the Mustang to the store to buy alcohol and cigarettes.  The women then drove around the neighborhood, enjoying the sunshine, listening to music and flirting with men, before arriving at Hoover Elementary School to retrieve Warren's five-year-old son.  During their drive, Warren alternated driving fast and then slowing down for corners to flirt with men.  At one point, the women drove down Sycamore Street and were noticed by defendant, who was visiting friends.  Upon seeing the Mustang, defendant ran into the middle of the street to confirm the red car had a small "doughnut" tire in the rear.

Defendant, his best friend Rico Cantres and Tyree or Raul Toscano Jr. then went in search of the Mustang in Cantres's 2007 Dodge Ram 1500 four-door pickup truck with tinted rear windows and five-spoke mag wheels.  Defendant, carrying in his waistband a fully-loaded .45-caliber semiautomatic handgun, got in the back seat while Tyree or Raul Jr. got in the front passenger seat.

Thus, while Warren and Bility were driving around Oakland "hitting the corners" (i.e., flirting with men) en-route to Hoover Elementary to pick up Warren's son, defendant and his friends were driving in pursuit of Warren's Mustang under the assumption that it was involved in the Sycamore Street drive-by shooting two days earlier.  Eventually, Warren reached the school, located on Brockhurst Street at West Street, double-parking in front in the westbound lane.  While there, Cantres drove by, saw the Mustang and parked across the street on the eastbound side.  There is some discrepancy about what then occurred.  However, defendant told homicide detectives that

3

he did not want to fire at the school because there were children nearby, and because he merely wanted to get the Mustang's license plate number to confirm it was the same vehicle involved in the March 25th shooting. He had the gun in his hand, but only for protection.

Meanwhile, Warren left the car to pick up her son, while Bility went in search of a cigarette light. Shortly thereafter, both women returned to the car, with Warren's son getting in the back seat. Driving away quickly, Warren proceeded west on Brockhurst to Market Street, where she rolled through the stop sign before turning left. Warren then made three more left turns as the women danced and listened to music, ultimately ending up back on Brockhurst in front of Hoover Elementary. This time, Warren took Brockhurst westward past Market Street to San Pablo Avenue.

At some point, Warren, upset about something related to her son's cell phone, told Bility to retrieve the phone from her son in the back seat, which Bility did. While Bility was turned around, the Mustang was intercepted by Cantres's truck at the intersection of Brockhurst, San Pablo Avenue and Filbert Street. Defendant, believing the Mustang had "come [to] block us off," moved from the right to left rear seat and fired about five to seven deliberate shots out the truck's open window from 10 to 12 feet away as the Mustang crossed the intersection toward Filbert Street. One of these shots shattered the driver's window; another shot went through the driver's door, passing through Bility's abdomen before landing on the floorboard; and still another struck Warren on the left side of her head, lodging in her brain and rendering her unconscious. The Mustang eventually came to a stop after crashing into two parked cars. Bility exited the vehicle with Warren's son to get help. Warren died later that evening at Highland Hospital. Bility spent weeks at the hospital, undergoing several surgeries, including to remove her spleen, and relearning how to walk.

The truck, meanwhile, proceeded one block north onto Brockhurst, turned right onto 33rd Street, right onto Market Street, left onto Brockhurst Street and then right onto West Street. As the truck passed Friendly Market, defendant jumped out, dropping the gun, which was in a cocked position, as well as a black beanie and bottle of lotion, before

4

walking south on West Street. The truck proceeded one more block to 32nd Street, at which point it was abandoned by the remaining occupants.

At the time of the shooting, Sergeant Frank Sierras was on San Pablo at 33rd Street talking to a local business owner. Hearing gun shots, Sergeant Sierras turned around to see an arm firing a gun from the left rear passenger window of a late model gray Dodge pickup truck. Sergeant Sierras did not see the intended target. He pursued the truck, but lost sight of it. Later, however, Sergeant Sierras responded to a reported sighting of the suspect vehicle and was able to identify it as the one involved in the shooting.

Meanwhile, Officer David McKaig responded to a crowd near Friendly Market on West and 31st Streets. Defendant was arrested a few minutes later after his description was given to another officer by a woman who had seen him drop the gun in front of Friendly Market. Defendant, who had lotion smeared on the bottom of his jacket, claimed to have done nothing wrong, but was later identified by a witness as being associated with the discarded gun and tested positive for gunshot residue on his hands. In addition, defendant's fingerprints and DNA were found on the discarded gun, and the lotion on his jacket was consistent with lotion smeared across the backseat of the abandoned truck.

At 8:03 p.m. that evening, a police officer took defendant to a homicide interrogation room. Defendant used the bathroom and napped on the table. At about 4:30 a.m. the next morning, Homicide Detectives Todd Crutchfield and George Phillips began to interview defendant, ending the interview at about 5:45 a.m. Initially, defendant denied involvement in the shooting. However, about two-thirds of the way through the interview, defendant confessed to it, claiming self defense. Specifically, defendant claimed the Mustang chased Cantres's truck to San Pablo Avenue, where the Mustang appeared to make a move to block the truck. At this point, defendant claimed, he began firing in hopes of forcing the Mustang to move and out of fear that someone in the Mustang would fire at them first.

Following this interview, defendant slept on the table in the interview room before later being interviewed by Deputy District Attorney Joni Leventis and Inspector Nina Garcia. During this second interview, which lasted from 9:44 a.m. to 10:56 a.m., defendant repeated much of what he had earlier disclosed to police, including his belief that he had acted in self defense. Defendant admitted, however, that he never saw a gun in the Mustang, although he assumed someone in the vehicle was armed. He also admitted then, when they located the Mustang parked outside the elementary school, he did not think they had a gun because "maybe when they came down Sycamore, they would have shot." Later, he believed they did have a gun because he saw someone leaning out the passenger-side window, the same position of the shooter during the March 25th shooting.

Once his interview with the District Attorney's office ended, the detectives returned and informed defendant that Warren had died, prompting him to ask: "So I'm going to jail for murder?" When Detective Crutchfield responded affirmatively, defendant then stated: "So me and my friend [Cantres] have murder."

An hour and a half later, defendant called his friend Tyree Jackson, telling him, among other things: "They got me for, um, murder and attempted murder. Yep. I'm – I'm done. [¶] . . . [¶] . . . I was just looking at this nigga [Cantres] two rooms down – he two rooms down – and you know he was in the car. [¶] . . . [¶] . . . He was in the car. But . . . they know I did it. They – they got the, um, they got the .45. It don't. It – it didn't even work though. [¶] . . . [¶] I'm saying, but I mean, they know I did it. They know I did it. It [the gun] didn't work."

Defendant next called Shakiyla Black, the mother of his young daughter, who was visiting the home of defendant's mother. Black asked defendant, "You confessed?" Defendant responded: "Yep. I did it. I mean it is what it is." Black could then be heard telling defendant's mother, "He say he . . . confessed," prompting his mother to take the phone and ask: "You confessed?" Defendant responded: "They got me on camera. It is – it is – I mean, it is what it is mama. They got me on camera." Black then returned to the phone and defendant continued: "They charging me for murder and attempted murder."

6

Finally, later the same day, defendant called his uncle, Arvell Nelson, telling him: "But – Uncle Arvella? [¶] . . . [¶] [T]he gun that I had, and the gun that they found, it was never – never fired. I told 'em – I told 'em I fired the gun. I told 'em I fired it and reloaded it, but the gun was never fired. It didn't – when I – when I tried to fire the gun, the gun didn't even work."

## II.     The Verdict, Judgment and Appeal.

On October 28, 2010, the jury found defendant guilty of both counts and found true all enhancements. On November 30, 2010, the trial court sentenced defendant under count one to life without the possibility of parole and to a consecutive 25-year-to-life enhancement for the firearm clause under section 12022.53, subdivision(d). On count two, the trial court imposed a sentence of life with the possibility of parole and a consecutive 25-year-to-life enhancement for the firearm clause under section 12022.53, subdivision (d). All lesser firearm clause enhancements in both counts were stayed. This timely appeal followed. This timely appeal followed.

## DISCUSSION

On appeal, defendant raises several arguments for our consideration. Specifically, defendant alleges the trial court prejudicially erred at trial by: (1) excusing a juror for cause based on her religious affiliation; (2) violating his Sixth Amendment right to counsel by permitting a law student to conduct a crucial evidentiary hearing without evidence in the record of his written consent; (3) violating his Fifth Amendment and due process rights by admitting statements he involuntarily made to police interrogators shortly after his arrest; (4) violating his *Miranda* rights by admitting statements he involuntarily and unknowingly made to representatives from the District Attorney's office following his arrest; (5) admitting irrelevant and inflammatory evidence relating to narcotics and other contraband found on his person during his arrest; (6) admitting speculative testimony from the district attorney regarding his state of mind and irrelevant testimony from two police officers regarding reasons why some victims refuse to cooperate with police; and (7) erroneously instructed the jury regarding his imperfect self

7

defense theory.  We address each argument in turn, as well as defendant's final argument that the cumulative prejudicial impact of multiple errors requires reversal.

## I.       Excusal of Prospective Juror Three.

### A.       Factual Background.

During voir dire, the trial court questioned prospective juror number three (juror three) regarding, among other things, her various non-professional affiliations as follows:

THE COURT:  In terms of churches, groups, organizations, religious or political groups outside of your profession?

JUROR THREE:  Well, I'm part of a spiritual community with my husband and currently thinking of going back to a chorus,

THE COURT:  What's the spiritual community about? What is that?

JUROR THREE:  Well, it's an alternative path.  It's not Judeo-Christian, not Buddhist. It's one that's often misunderstood.

THE COURT:  Does it have a name?

JUROR THREE:  Well, you could call me.

THE COURT:  I don't want to call you anything.

JUROR THREE:  Wiccan.  Neopagan.

THE COURT:  How did you get into that?

JUROR THREE:  Friends when I was looking around for some kind of guidance in my life invited me to come along to some events and it just seemed to fit for me.

THE COURT:  You're pretty active in that group?

JUROR THREE:  Yeah.

Later, during an *in camera* discussion regarding challenges for cause, the trial court *sua sponte* excused juror three:

THE COURT:  Any other challenges by anyone?

PROSECUTION:  Not by the People.

THE COURT:  Defense counsel?

DEFENSE:  Not at this time.  Thank you, your Honor.

THE COURT: I have a challenge for cause for juror number three. I can't imagine either one of you taking that lady. A neopagan?

PROSECUTION: I'd certainly stipulate to her, your Honor.

DEFENSE: I'll submit it. I wasn't offended by that. I thought she could be fair.

THE COURT: Well, you haven't smelled her.

DEFENSE: No, I have not.

THE COURT: She stinks. She doesn't bathe. Ask Bervin.

DEFENSE: I'll submit it.

THE COURT: All right. I'll excuse her.

### B. Applicable Law.

Defendant raises two related arguments with respect to the trial court's excusal of juror three for cause. First, he contends the trial court committed reversible error by dismissing juror three based on religious discrimination in violation of the California and federal constitutions. Alternatively, defendant contends the trial court's arbitrary and discriminatory excusal of juror three constituted judicial misconduct that "tainted the proceedings," requiring reversal.

The prosecution disagrees on two grounds. First, the prosecution contends defendant waived his claims by failing to object to juror three's excusal before the trial court. Second, the prosecution contends that, in any event, the trial court's action was not based on religious discrimination but rather on a reasonable concern about juror three's offensive odor and its potential detrimental impact on other jurors' ability to competently discharge their duties. We address each of these contentions in turn, keeping in mind that, " '[i]n general, the qualification[s] of jurors challenged for cause are "matters within the wide discretion of the trial court, seldom disturbed on appeal." ' [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 655-656 [*People v. Holt*].)

### 1. Waiver.

As the record set forth above reflects, the trial court sua sponte advised the parties: "I have a challenge for cause for juror number three. I can't imagine either one of you

9

taking that lady. A neopagan?" Upon hearing the trial court's statement, the prosecutor immediately agreed to stipulate to excusing juror three and defense counsel, while stating that he was not offended by her, offered to submit the issue. At that point, the trial court replied that juror three "stinks" and "doesn't bathe," in response to which defense counsel again offered to submit the issue without raising an objection. Whether defense counsel's conduct amounted to forfeiture is governed by the following authority.

"A fundamental tenet of our system of justice is the well-established principle that a party's failure to assert error or otherwise preserve an issue at trial ordinarily will result in forfeiture of an appeal of that issue. ' "The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had." ' [Fn. omitted.] [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 636 [*People v. McKinnon*].) Relevant here, "[t]his [forfeiture rule] applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*Id*. at p. 638.)

In *People v. McKinnon*, a quite recent decision, the California Supreme Court abandoned the previously-recognized no-forfeiture rule with respect to *Witherspoon*/*Witt* juror excusal error.[4] In doing so, the high court *prospectively* set forth a rule requiring counsel or pro se defendant "to make either a timely objection, or the functional equivalent of an objection (i.e., statement of opposition or disagreement) to the excusal

---

[4]     "In *Witherspoon v. Illinois* (1968) 391 U.S. 510 . . . (*Witherspoon*), the United States Supreme Court held that a death sentence cannot be carried out if the jury that imposed or recommended the penalty was selected by excluding prospective jurors for cause 'simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' [Citation.]) In *Wainwright v. Witt* (1985) 469 U.S. 412 . . . (*Witt*), the high court clarified the standard enunciated in *Witherspoon* and held that a prospective 'juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the [prospective] juror is not substantially impaired, removal for cause is impermissible.' [Citations.] Under *Witt*, a prospective juror is 'substantially impaired' and may properly be excused for cause if he or she is unable to follow the trial court's instruction and 'conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" (*People v. McKinnon, supra,* 52 Cal.4th at p. 635.)

10

on specific grounds under *Witherspoon*/*Witt* in order to preserve the issue for appeal." (*People v. McKinnon, supra,* 52 Cal.4th at p. 636.)

Defendant claims that, under *People v. McKinnon*, the forfeiture rule applies only prospectively and, thus, does not apply to his case because his trial occurred before the decision was issued. However, as stated above, *People v. McKinnon* is a *Witherspoon/Witt* case. In cases, like this one, involving the excusal of a juror on grounds other than *Witherspoon/Witt*, the high court had already held that the forfeiture rule applies. For example, in *People v. Holt, supra,* 15 Cal.4th 619, a challenge-for-cause case based on the prospective juror's potential conflict of interest with the prosecution, the high court explained: "We have held in analogous situations that an objection is necessary to enable the court to avoid or correct error. In *People v. Champion* (1995) 9 Cal.4th 879, 907 . . . , e.g., we held that the defendant failed to preserve the issue for appeal when he failed to object on the ground asserted on appeal ─ that he had been denied a jury drawn from a representative cross-section of the community because wage earners were systematically excluded when the trial court granted hardship excuses to several jurors. In *People v. Fauber* (1992) 2 Cal.4th 793, 816 . . . , we held that failure to object to the panel or move to quash the venire on the basis that excusing hearing-impaired prospective jurors denied the defendant the right to a jury drawn from a representative cross-section of the community waived the point. In *People v. Howard* (1992) 1 Cal.4th 1132, 1159 . . . , we held that an appellate claim that the trial court's excusal of prospective jurors for hardship resulted in a venire that did not fairly represent the Hispanic population of the county was waived. In *People v. Gallego* (1990) 52 Cal.3d 115, 166 . . . , we applied the rule to an appellate claim that the court should have inquired into the prosecutor's use of preemptory challenges to remove Blacks from the jury. Then, in *People v. Visciotti* (1992) 2 Cal.4th 1, 38 . . . , we acknowledged the court's obligation to comply with statutory jury selection procedures designed to ensure random selection, but held that a failure to object could, nonetheless, constitute a waiver. '[I]mportant policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has

acquiesced. (Cal. Const., art. VI, § 13; *People v. Edwards* (1991) 54 Cal.3d 787, 813 . . .) The failure to object will therefore continue to constitute a waiver of a claim of error on appeal.' " (*People v. Holt, supra*, 15 Cal.4th at pp. 656-657.)

In so holding, the California Supreme Court provided another reason for applying the forfeiture rule in the context of juror excusals: "We cannot assume that a party who fails to object to the excusal of a juror wants to have that juror on the panel. Taking a neutral position as defendant did here may be a tactical choice. If the juror is excused, the defendant need not use a peremptory challenge to remove the juror. Having made that choice the defendant should not be heard to complain on appeal that excusing the juror was reversible error." (*People v. Holt, supra*, 15 Cal.4th at pp. 656-657.)

The facts of our case are well served by the aforementioned policies underlying the forfeiture rule. First, as noted in *People v. McKinnon, supra,* 2 Cal.App.4th 610, had defense counsel articulated to the trial court the same objection he raises before this court, defense counsel would have alerted the trial court to the possible constitutional implications of its decision to excuse juror three. And, even more important, raising an objection below would have given the trial court the opportunity to state on the record a valid non-discriminatory reason for excusing juror three or, if it did not have one, the opportunity to reconsider its decision. (See also *People v. Lewis* (2008) 43 Cal.4th 415, 481-482 [applying the forfeiture rule to a challenge to the prosecutor's excusal of Hispanic jurors where "the record does not reflect whether the trial court ignored counsel's comments about Hispanics, or simply forgot about them" and counsel failed to secure a ruling]; *People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 ["As a general rule, a defendant may properly raise in this court a point involving a trial court's allegedly improper discharge of a juror only if he made the same point below"].) Second, as in *People v. Holt*, there is no basis in this case for assuming defendant in fact wanted juror three to serve on his jury. To the contrary, he may have failed to object for strategic reasons and, thus, should not now be permitted to complain. Indeed, not once, but twice, defense counsel passed up the opportunity to place on the record his objection to the trial court's excusal of juror three for cause, submitting the issue without argument.

Thus, in light of defense counsel's failure to object and his willingness to twice submit the matter to the trial court, we conclude defendant has forfeited the right to challenge juror three's excusal.

### 2. The Merits.

In any event, even assuming for the sake of argument defendant did not waive the right to challenge the excusal of juror three, we would nonetheless conclude defendant failed to prove reversible error. In reaching this conclusion, we begin by agreeing with defendant that exclusion of a prospective juror solely on grounds of religious affiliation is improper. (*People v. Williams* (2006) 40 Cal.4th 287, 308; compare *People v. Avila* (2006) 38 Cal.4th 491, 541 ["use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution" and "the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution"].)[5] As the California Supreme Court held in the seminal case of *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277, "remov[ing] prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative

---

[5] Defendant does not dispute that the trial court had authority to excuse a juror for cause on its own motion, so long as the basis for the excusal was valid. (*People v. Jimenez* (1992) 11 Cal.App.4th 1611, disapproved on other grounds in *People v. Kobrin* (1995) 11 Cal.4th 416, 419.) And while "exclusion of a prospective juror on grounds of religious affiliation is improper (see *In re Freeman* (2006) 38 Cal.4th 630, 643 [42 Cal.Rptr.3d 850, 133 P.3d 1013]), it is not necessarily true that inquiry into such affiliation is forbidden during voir dire. [For example,] [m]embership in a particular religious denomination or sect indicated on a jury questionnaire may alert the trial court and counsel to a potential bias in favor of or against the death penalty that requires further exploration at voir dire. (See *People v. Catlin* (2001) 26 Cal.4th 81, 118 [109 Cal.Rptr.2d 31, 26 P.3d 357] [prospective juror identified himself with a particular denomination that believes that God is the only one with the right to take someone's life].)" (*People v. Williams* (2006) 40 Cal.4th 287, 308. See also *People v. Martin* (1998) 64 Cal.App.4th 378, 384-385.)

cross-section of the community under article I, section 16, of the California Constitution."[6] In this case, however, given defense counsel's failure to properly challenge the excusal of juror three below, the trial court was not called upon to articulate the specific basis for its decision. (See *People v. Holt, supra*, 15 Cal.4th at p. 656.) While defendant insists the trial court's decision was improperly based on religious discrimination, we decline to infer, in the absence of a clear record, that the court excused juror three on the sole ground of her membership in a religious organization (to wit, her membership in a Wiccan or Neopagan organization) in violation of clear California law.

In so concluding, we note that, while the trial court did indeed refer to juror three as "a Neopagan," the court did not explicitly identify her religious affiliation as the basis for excusing her. The court could simply have referred to juror three by her religious affiliation as a way to identify her to counsel. The court also referred to the fact the she had an offensive odor and apparently did not bathe. Based on the record before us, the trial court could have reasonably believed other jurors would be distracted and thereby impaired in discharging their duties due to juror three's extreme lack of hygiene. However, as we have already explained, in the absence of a timely and specific objection to juror three's excusal, and a subsequent ruling on such objection, we are left without any basis for concluding the trial court acted solely on the basis of a discriminatory purpose. (See *People v. Holt, supra*, 15 Cal.4th at p. 651 ["we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, *giving deference to the trial court which had the opportunity to observe . . . the juror*"] (italics added).)

---

[6]  While California law is clear that "religious membership constitutes an identifiable group under *Wheeler* [citations] . . . [t]he United States Supreme Court has not similarly extended *Batson*, although a number of state and federal courts have done so. [Citations.]" (*In re Freeman* (2006) 38 Cal.4th 630, 643.) In *In re Freeman*, the California Supreme Court "[a]ssum[ed] without deciding that *Batson*, like *Wheeler*, applies to peremptory challenges based upon bias against religious groups." (*In re Freeman, supra,* 38 Cal.4th at p. 643. See also *People v. Williams, supra*, 64 Cal.App.4th at p. 384 [concluding that the rule of *Batson v. Kentucky* extends to religious discrimination].)

14

Finally, even if we were to assume the trial court erred in excusing juror three, we would nonetheless find no basis for overturning the judgment. " '[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment.' [Citation.]" (*People v. Holt, supra*, 15 Cal.4th at p. 656.) Indeed, this rule is particularly apt here, given that, one, defendant submitted to the trial court's decision to excuse juror three and, two, he does not claim to have been deprived of the right to a fair and impartial jury as a result of juror three's excusal. We thus proceed to the next issue.

**II.    Law Student Representation at Trial without Defendant's Consent.**

At the hearing on defendant's motion to suppress evidence of his recorded statements to law enforcement, defendant was represented by a recent law graduate, T.D., who was working as a certified law clerk under defense counsel's direct supervision. The authority for T.D.'s representation is California Rules of Court, rule 9.42(d)(3). This rule permits a certified law student to "[a]ppear on behalf of the client in any public trial, hearing, . . . or before any . . . court . . .  to the extent approved by . . . [the] court provided that the certified law student:  [¶] (A) Obtains the approval of the supervising attorney to engage in the activity; [¶] (B) Performs the activity under the direct and immediate supervision and in the personal presence of the supervising attorney . . . [¶] (C) Obtains a signed consent form from the client on whose behalf the certified law student acts . . . approving the performance of such acts by such certified law student or generally by any certified law student; and [¶] (D) As a condition to such appearance, either presents a copy of the consent form to the . . . court . . . or files a copy of the consent form in the court case file . . . ."  (California Rules of Court, rule 9.42(d)(3).)

Here, defendant contends T.D.'s appearance at the suppression hearing was prejudicial error because there is no evidence in the record he signed a consent form approving T.D.'s appearance, or that a copy of such consent was presented to the court. According to defendant, this purported error constituted "a complete denial of [his right to] counsel," thereby requiring reversal. We disagree.

The burden is on the party asserting error – in this case, defendant – to prove such error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'All intendments and

presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown' "].) Here, defendant directs us to nothing in the record to prove the prosecution or court failed to comply with the mandatory requirement to "either present[] a copy of the consent form to the . . . court . . . or file[] a copy of the consent form in the court case file . . . ." (California Rules of Court, rule 9.42(d)(3)(D).) As the prosecution notes, trial courts often deal with procedural matters off the record, particularly where such matters are not contested by the parties. In this case, it is indeed possible T.D. or supervising defense counsel presented a copy of the requisite consent form to the court when there was no court reporter present or actively engaged. Nothing in the above-mentioned rule requires on-the-record compliance. And, under well-established rules of appellate review, we decline to infer error was committed, particularly reversible error, based on mere silence in the record. (*Cable Connection, Inc. v. DIRECTV, Inc*. (2008) 44 Cal.4th 1334, 1362 [affirming the "familiar rule that the decision under review is presumed correct on matters where the record is silent"]; *People v. Nance* (1991) 1 Cal.App.4th 1453, 1456 ["It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties"]. See also Cal. Const. art. VI, § 13 [a defendant's conviction will not be set aside for any error unless "a miscarriage of justice" has occurred].)

In reaching this conclusion we briefly address defendant's related constitutional argument, based on out-of-state authority, that "a law student's failure to file the requisite written consent requires automatic reversal" because such failure infringes on the defendant's Sixth Amendment right to counsel. We find no basis in California law for defendant's proposed automatic reversal rule and, in any event, conclude his argument fails as a factual matter given the lack of any affirmative evidence of the law student's failure to file a consent in this case. As the California Supreme Court explained in another case involving an alleged failure to comply with rules governing certified law student representation, "Defendant's argument [that his written consent is invalid unless the record demonstrates that it was made knowingly and intelligently after having been

advised of the dangers of his decision] rests on the premise that consent to representation by a certified law student under the Rules must be regarded as a waiver of defendant's right to the assistance of counsel, and hence must comply with the standards established for waivers of constitutional rights. We reject that premise. Because defendant was at all times represented by both an actively participating supervising attorney and a certified law student, he did have representation of counsel. Accordingly, no waiver of his right to counsel was required by either state or federal Constitution. Consequently, *Faretta v. California* [(1975) 422 U.S. 806, 835], and other cases establishing requirements for valid waivers of constitutional rights [citations] are not on point." (*People v. Perez* (1979) 24 Cal.3d 133, 143-144 (*People v. Perez*).)

In so concluding, the California Supreme Court acknowledged the defendant's point, also made here, that consent to representation by a certified law student must be knowingly and voluntarily given. However, the possibility the defendant did not provide valid consent to such representation does not compel reversal of the judgment: "The State Bar Rules [Governing the Practical Training of Law Students promulgated by the State Bar of California in 1969, prior to enactment of rule 9.42(d)(3)] themselves should, of course, be read to require that any consent be knowingly and intelligently executed. *But since constitutional rights are not at stake, the presumption that 'official duty has been regularly performed' (Evid. Code, § 664) should be sufficient to place on defendant the burden of showing the invalidity of the consent.*" (*People v. Perez, supra,* 24 Cal.3d at pp. 138, 143 (italics added).)

Of course, the issue in *People v. Perez* was whether the defendant met his burden to prove his written consent to representation by a certified law student was involuntary. (The defendant there did not.) Here, to the contrary, the issue is whether defendant in fact executed the requisite written consent. However, despite this factual distinction, we conclude the same legal principle applies. Specifically, because the constitutional right to counsel is not implicated where, as here, defendant is undisputedly represented by a certified law student acting under the direct supervision of the defense attorney of record (*People v. Perez, supra,* 24 Cal.3d at pp. 143-144), the general presumption that "official

17

duty has been regularly performed" remains in force. As stated above, defendant has provided nothing in the record apart from mere silence to support his claim that the trial court failed to discharge its duty to obtain his written consent to T.D.'s representation. We thus decline to presume any such failure occurred.

### III.   Admission of Defendant's Initial Statements to Police Interrogators.

As set forth above (pp. 5-6, *ante*), defendant was interviewed in the early morning hours after the shooting by homicide detectives Crutchfield and Phillips. At the start, around 4:30 a.m., defendant waived his *Miranda* rights, signing an advisement indicating he understood such rights and nonetheless agreed to speak to the detectives. During the interview, defendant initially denied involvement in the shooting. However, about two-thirds of the way through the interview, defendant confessed, telling the detectives that he fired defensive shots at the Mustang after it blocked the path of their truck on San Pablo Avenue, fearing the Mustang's occupants would fire at them first.

At trial, defendant moved to suppress his recorded statements to the homicide detectives, arguing his *Miranda* and other constitutional rights were violated because his statements were neither freely nor voluntarily given. The trial court rejected his motion, a ruling defendant now challenges on appeal. The following legal principles govern our review of his claim.

The relevant law is not in dispute. Under the Fourteenth Amendment of the U.S. Constitution and article I, section 15 of the California Constitution, a defendant's waiver of *Miranda* rights is invalid and any subsequent confession inadmissible if not voluntarily given. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "A statement is involuntary if it is 'not " 'the product of a rational intellect and a free will.' " ' [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"[I]n order to determine whether a defendant voluntarily, knowingly, and intelligently has waived his *Miranda* rights, a court analyzing the question must consider two distinct components: 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than

18

intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.] [¶] . . . [¶] . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.' ([*Moran v. Burbine* (1986)] 475 U.S. [412,] 421, 422-423 [106 S.Ct. [1135,] 1141], fn. omitted.)"  (*People v. Whitson* (1998) 17 Cal.4th 229, 247.)

The prosecution bears the burden of proving the defendant's waiver of rights and subsequent incriminating statements were voluntarily made.  (*People v. Whitson, supra,* 17 Cal.4th at p. 248.)  A showing of voluntariness must be based on "all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation."  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093.)  These circumstances include the defendant's intelligence, sophistication and prior experiences, his mental and physical state at the time of interrogation, and the methods employed by his interrogators.  (*People v. Lewis* (2001) 26 Cal.4th 334, 383; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.)  With respect to interrogation methods, police conduct rendering involuntary a confession or waiver of rights may include either physical intimidation or more subtle psychological pressure, so long as such conduct is capable, under the circumstances, of "overbear[ing] a 'rational intellect and a free will' [Citation.]"  (*People v. Flores* (1983) 144 Cal.App.3d 459, 468 (italics omitted).)

On appeal, we decide *de novo* whether a defendant's waiver of rights and subsequent confession were voluntary.  (*People v. Memro* (1995) 11 Cal.4th 786, 826.)  In making this decision, we defer to the trial court's underlying factual findings if supported by substantial evidence.  (*Ibid.*)

Here, the following facts are relevant to defendant's challenge to the admission of his statements to homicide detectives. First, with respect to his own background, defendant points out that he was only 18-years old, lived at home with his mother, had dropped out of school and had a minimal criminal background.

With respect to interrogation conditions, we note defendant's interview did not begin until 4:30 a.m. and lasted about an hour and 20 minutes. For about two thirds of the interview, defendant repeatedly denied involvement in the crime; however, at that point, he confessed to shooting at the Mustang, while insisting it was in self defense.

As defendant points out, when the detectives first entered the interview room, he had been in custody about 12 hours and was asleep on the table. He had not eaten or drunk anything since before his arrest, having turned down an officer's offer of food, drink and use of the bathroom when he was arrested at 4:40 p.m. At that time, the officer told defendant that, if he changed his mind regarding food, drink or visiting the bathroom, he could simply knock on the door, but he never did so. Defendant did at some point ask to call his girlfriend or mother, but was told to wait until a more appropriate time.

The detectives asked defendant a few basic questions regarding his identity and background before reading him his *Miranda* rights. Defendant responded, "yes, yes," when asked whether he understood those rights, and "yep, . . . go ahead," when asked whether the detectives could begin questioning him. Defendant then confirmed in writing his understanding of rights and willingness to be questioned by initialing a standard police form.

With respect to the interrogation itself, the detectives engaged in a number of different tactics. For example, at times, the detectives appeared to minimize the severity of the crime, telling defendant he was "getting way too excited about . . . something that really ain't that serious" and was "blowing it out of proportion." In addition, the detectives warned defendant that, by not incriminating himself, he was "digging himself into a deeper hole" and making himself look like "a monster." If defendant admitted involvement, on the other hand, he would look like "a good person inside who just makes

20

mistakes from time to time, maybe makes bad decisions like all of us do." The detectives also exaggerated the evidence against defendant, telling him he was seen firing the murder weapon by a police officer and on several different surveillance cameras. Finally, defendant says the detectives "denigrat[ed] the victim and her family," calling them "dirty" and suggesting they were well-known to police. Defendant claims that, after suffering through hours of these "coercive tactics," he confessed.

Having considered the totality of all surrounding circumstances, as the law requires, we reject defendant's claim that his confession to homicide detectives was involuntary. In doing so, we first reject the notion that defendant's youth and lack of sophistication and formal education undermined the voluntariness of his confession. Indeed, in making this suggestion, defendant omits other relevant facts in the record, including his status as a legal adult and his possession at the time of arrest of individually wrapped packages of narcotics, $524 in cash and fake identification cards. There is also evidence defendant was involved in the criminal justice system as a juvenile, and thus had likely received *Miranda* warnings in the past. As such, it appears defendant's personal characteristics weigh in favor of, rather than against, a finding of voluntariness.

We reach the same conclusion with respect to defendant's interview conditions. While defendant correctly notes his lack of food, drink and a significant amount of sleep, he omits the fact that officers told him to simply knock on the door if he needed to consume something or to use the bathroom, and that he did in fact use the bathroom. And, while the interview was held in the early morning hours after defendant had been in custody 12 hours, two different officers found defendant asleep at different times – to wit, Officer Gerrans at 10:09 p.m. and Detectives Crutchfield and Phillips at 4:26 a.m. There is nothing in the record to prove defendant slept for this entire six hour period; however, nor is there anything suggesting defendant was prevented from doing so by law enforcement if he had so chosen.

Finally, and most importantly, we turn to the techniques employed by Detectives Crutchfield and Phillips in attempting to obtain, and eventually succeeding in obtaining, defendant's confession. As a general matter, the record supports defendant's argument

that the detectives used three primary tactics during the interrogation – to wit, they advised defendant the situation would be much worse if he did not take responsibility for the crime, warned him that he was seen committing the crime (by a police officer and on a surveillance video), and minimized the seriousness of his crime. However, this is just the start of our inquiry.

First, with respect to the detectives' advice to defendant that failing to take responsibility for his conduct would worsen his situation (mainly, by making him appear as "a monster" to jurors), we find no problem. As the California Supreme Court explains: "[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . '[W]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People v. Belmontes* (1988) 45 Cal.3d 744, 773, overruled on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) Here, defendant identifies no actual threat or promise of leniency (or of anything else) accompanying the detectives' advice to confess, and we have found none, beyond "that which flows from . . . truthful and honest . . . conduct" – to wit, the advice that jurors would view defendant in a better light if they believed he had taken responsibility for his crime. (*People v. Belmontes, supra,* 45 Cal.3d at p. 773.) Indeed, there is more than a hint of truth to their advice. As such, their conduct was not improper. (Compare *People v. Jones* (1998) 17 Cal.4th 279, 298 ["the detective's offers of intercession with the district attorney amounted to truthful implications that his cooperation might be useful in later plea bargain negotiations"].)

Likewise, we find no problem with the instances where the detectives appear to have exaggerated the strength of the evidence against defendant by telling him he was seen by a witness or on camera committing the crime. In the record, there are two video recordings of Cantres's truck passing by Friendly Market, once before and once after the shooting. In addition, there indeed were eyewitnesses to the shooting, including Police Sergeant Sierras who saw the shooting and then saw Cantres's truck immediately pass by.

22

The same officer a short time later found the truck abandoned near the market. And, while this officer did not actually see defendant fire a gun, another witness identified defendant as the person who exited the truck seconds after the shooting, and yet another witness saw defendant drop the gun as he walked down West Street. On this record, we cannot conclude the detectives' exaggeration tactics rendered defendant's statements involuntary. (*People v. Jones, supra,* 17 Cal.4th at pp. 297-298 [" 'only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable' " are prohibited].)

Finally, with respect to the detectives' efforts to minimize the seriousness of the crime, the record reveals defendant knew quite well the gravity of his situation, despite this police tactic. For example, when the detectives told defendant he was "blowing it out of proportion," he responded with clear sarcasm: "I'm down here for a shooting – I'm blowing it out of proportion?" Then, when one of the detectives claimed "it ain't like the crime of the century or nothing," defendant replied incredulously: "A shooting? [¶] . . . [¶] You know how serious a shooting is and I blow it out of proportion?" Where, as here, a defendant does not appear misled by officers' attempts to downplay what has occurred, there is no basis for overturning the trial court's admission of the defendant's subsequent statements. As the California Supreme Court explains, even if there is evidence that police officers resorted to threats, promises or other improper influences in trying to extract a defendant's confession, the confession is involuntary as a matter of law "only if the [improper influence] actually induces the defendant to make the statement." (*People v. Lucas* (1995) 12 Cal.4th 415, 442.) " 'If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.' [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 778-779.)

Finally, in rejecting defendant's challenge, we nonetheless acknowledge his point that the detectives initially failed to tell him the victim of the shooting had died, exposing him to a possible murder charge. As is often the case during police interrogations, the detectives did not at that time know the full extent of defendant's involvement in the

23

crime.  Nothing in the law precluded them from employing a certain level of trickery in their efforts to ascertain the truth.  "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and gathering proof.' [Citation.]"  (*People v. Jones, supra,* 17 Cal.4th at pp. 297-298.  See also *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 ["So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible . . . ."]; *People v. Jones, supra,* 17 Cal.4th at p. 299.)

Thus, as the California Supreme Court has held, "[v]oluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of circumstances.' [Citation.]"  (*People v. Neal* (2003) 31 Cal.4th 63, 79.)  In this case, having considered the record as a whole, we reject defendant's contention that the detectives investigating his crime crossed into the realm of illegality when attempting to elicit his confession.[7]

## IV.    Admission of Defendant's Statements to the Deputy District Attorney.

After Detectives Crutchfield and Phillips finished interviewing defendant shortly before 6:00 a.m., defendant again fell asleep on the interview room table.  Then, at 9:44 a.m., Deputy District Attorney Leventis (Leventis) and Investigator Garcia (Garcia)

---

[7]    Indeed, as the prosecution points out, the evidence suggests defendant may have been lying to detectives during the interview about certain details of the shooting to lessen his criminal liability.  For example, defendant told detectives he fired at the Mustang with the gun later found discarded on the street near the shooting; however, shortly after the interview, he told his uncle in a recorded call that the gun was inoperable.  He also told detectives the Mustang had blocked off Rico's truck at the intersection of San Pablo Avenue and Brockhurst Street, although eyewitnesses stated otherwise.  This evidence further undermines defendant's claim that his will was overborne by the detectives' coercive tactics.  (*People v. Johns* (1983) 145 Cal.App.3d 281, 293 ["admittedly l[ying] to the detectives throughout the interview. . . . is not the behavior of one whose free will has been overborne"].)

24

entered the room. During the subsequent hour and ten minute interview, defendant again waived his *Miranda* rights and made certain video-recorded statements to Leventis and Garcia, the admission of which defendant challenges on appeal. The following facts are relevant to his challenge.

Detective Crutchfield introduced Leventis and Garcia as "the district attorney and . . . her inspector, these are people that I told you that I had to talk to."[8] Turning to Leventis, defendant asked: "You're a lawyer? Oh, I was just going to ask if I could see one." Leventis responded: "Yeah, you're ─ well let me ask you this. What did you just tell me? You wanna talk to us first or I was gonna go through some stuff with you. I'm Joni Leventis. I'm the Deputy D.A., so I'm a district attorney." Leventis then introduced Garcia as "basically a cop who works with the D.A.'s office, okay?"

At this point, Leventis read defendant his *Miranda* rights, expressly advising him "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned." Defendant declined to exercise these rights and, as he did with homicide detectives, initialed the standard waiver form indicating his willingness to speak with Leventis without his attorney present. Leventis then explained to defendant that, after the interview, the police report would go "to the D.A.'s office, not me. Different D.A. to take a look at the report with your statement and all the stuff you say to decide if there are gonna be charges that are gonna be filed." Then, Leventis said, "as long as you're ready - you ready to talk to us . . . ," and defendant confirmed: "Oh, yeah."

When the interview ended just over an hour later, defendant stated: "Hey, excuse me? [¶] . . . [¶] Can I have your number . . .[?]" Leventis, surprised, responded: "Me?" Defendant replied: "Yeah, the D.A." The following colloquy ensued:

---

[8]    At the conclusion of his interview with homicide detectives, defendant asked whether he was going straight to jail. Detective Crutchfield responded "no," and explained that "we gotta run this by our superiors . . . let them know how this went and then uh they'll tell us how to proceed from there."

LEVENTIS:  Well, you know, you understand what D.A.'s do, right?  You still want my phone number?

DEFENDANT:  Well . . .

LEVENTIS:  Hey, Todd [Crutchfield].

DEFENDANT:  . . . What do you do? Can you tell me?

LEVENTIS:  Yeah, we're – we're the prosecutors.  I'm not a defense attorney, you understand . . . .

DEFENDANT:  Oh.

LEVENTIS: . . . wanted to do but I'll give you ─ you want me to write my name down for you?

DEFENDANT:  Nah.  This whole time I thought you was, umm . . .

LEVENTIS:  No, I talked to you about . . .

DEFENDANT: . . . my side.

LEVENTIS: . . . me being a District Attorney.

DEFENDANT: All right. All right.  I need ─ all right.

LEVENTIS: You know, your attorney don't advise you of your rights before they 'cause that, you know what I'm saying that's why I advised you of your rights, had you sign that, all right?

DEFENDANT: I ─ I misunderstood, yeah.

LEVENTIS:  No, that's okay but you were truthful with us, yeah?

DEFENDANT: Yeah.

LEVENTIS:  So that's why I told you my boss would have to decide if, what he's gonna charge you with, that would be what the D.A. does, okay? All right.  You take care.

DEFENDANT:  Mm-hm."

On appeal, based on the record set forth above, defendant contends the trial court improperly admitted his statements to Leventis because he:  (1) made an unambiguous request for counsel, and (2) even if he waived his right to counsel, his waiver was invalid because he believed Leventis was in fact his counsel.  The following rules apply.

"[U]nder the due process clause of the Fourteenth Amendment to the United States Constitution . . . an involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding." (*People v. Neal, supra,* 31 Cal.4th at p. 67.) Rather, a statement obtained by an officer from a suspect during a custodial interrogation "may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer." (*Ibid.*) Further, if at any time the suspect indicates that he does not wish to speak to the officer, or does not wish to speak to the officer unless counsel is present, the interrogation must end and may not resume unless and until counsel is present or the suspect voluntarily initiates further contact. (*Ibid.*)

However, the law is equally clear that, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Davis v. United States* (1994) 512 U.S. 452, 459.) "Rather, the suspect must unambiguously request counsel." (*Ibid.* See also *People v. Bacon* (2010) 50 Cal.4th 1082, 1107 ["defendant's invocation of the right to counsel must be clear and unambiguous"]; *People v. Johnson* (1993) 6 Cal.4th 1, 27, overruled on another ground by *People v. Rogers* (2006) 39 Cal.4th 826, 879.)[9]

Applying these principles to the facts at hand, we reject defendant's challenge to the admission of his statements to Leventis on *Miranda* grounds. Specifically, we conclude based on the record as a whole, including defendant's overall conduct during

---

[9] The U.S. Supreme Court has stated that, when a suspect's statement is ambiguous or equivocal, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." (*Davis v. United States, supra*, 512 U.S. at p. 461.) However, the court expressly "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (*Id.* at pp. 461-462.)

the interrogation, his single ambiguous and tentative reference to wanting to speak with an attorney ("I was just going to ask if I could see one"), and his willingness, after being told of his rights, to answer Leventis's questions, that substantial evidence supports the trial court's finding of voluntary waiver. (See *People v. Guerra, supra*, 37 Cal.4th at p. 1093; *People v. Johnson, supra,* 6 Cal.4th at p. 30.)

In particular, we first note that at no point did defendant actually request to speak to an attorney. Rather, when introduced to Leventis, defendant asked whether she was an attorney and then stated: "I was just going to ask if I could see one." Reasonably interpreted, defendant's statement that he "was just going to ask if I could see [an attorney]" is not a clear, unequivocal invocation of his right to counsel. While his statement may indicate possible confusion as to Leventis's role, that is not enough to establish a violation of his *Miranda* rights. This is particularly true where, immediately after his statement, Leventis not only advised defendant of his rights to "remain silent" and "to talk to an attorney and have him present with you while you're being questioned" (the second time that day he had been so advised), but also explained to him that any statements he made to her would be given to a "[d]ifferent D.A. to take a look at the report with your statement and all the stuff you say to decide if there are gonna be charges that are gonna be filed." (*People v. Johnson, supra*, 6 Cal.4th at pp. 28-30 [rejecting as equivocal the defendant's statement that "[m]aybe I ought to talk to a lawyer"].) Indeed, after receiving all of this information, defendant at no point requested legal advice or to speak to another attorney. Rather, he fully engaged with Leventis and Garcia, answering questions for over an hour without once objecting or indicating any unwillingness to proceed.

In rejecting defendant's challenge, we do not ignore his citation to the portion of the record immediately following the interview, where he appears confused about Leventis's role in his case and indicates his belief she was on "my side." However, in assessing the voluntariness of a defendant's waiver of *Miranda* rights, we must look at a totality of the circumstances surrounding his waiver. (*People v. Williams* (2010) 49 Cal.4th 405, 425.) Having done so, we believe this after-the-fact record of defendant's

28

confusion is less significant than his immediate reaction to Leventis's reading of his rights and her clear request that he present his waiver of rights in writing, a process that he had already been through a few hours earlier with Detectives Crutchfield and Phillips (who obviously were not on "[his] side"). (See *Davis v. United States, supra*, 512 U.S. at p. 460 ["the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves"].) This is particularly true given defendant's other post-interrogation conduct. To wit, having already confirmed with the detectives that law enforcement would monitor his phone calls, defendant told two separate individuals (his mother and his daughter's mother) in a phone call made less than two hours after the interrogation that he had "confessed" to the crime. On this record, we find no grounds for reversing the trial court's decision to admit defendant's statements.

## V. Admission of Evidence relating to Defendant's Possession of Illegal Contraband.

Defendant also challenges the trial court's admission of evidence relating to drugs and other contraband found on his person during a police search shortly after his arrest. This contraband included two plastic baggies of marijuana, five individual packages of crack cocaine, government-issued identification cards for two unrelated people, and $524 in cash. On appeal, defendant contends evidence of this contraband should have been excluded as irrelevant. We disagree.

Generally, all relevant evidence is admissible. (*People v. Champion* (1995) 9 Cal.4th 879, 922.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) Moreover, even relevant evidence may nonetheless be excluded if the trial courts finds that its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

On appeal, a trial court's decision to admit or exclude evidence is reviewed solely for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193. See also *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

Having considered the record at hand, we find nothing arbitrary, capricious, or patently absurd about the trial court's admission of the challenged evidence. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.) Specifically, evidence that defendant carried individual packages of narcotics (but no personal drug use device), fake identifications and a substantial amount of cash at the time of his arrest was relevant to at least two issues at trial ─ to wit, defendant's state of mind and credibility. First, with respect to state of mind, the evidence was relevant to the prosecution's theory that defendant shot the victims, not out of self defense, but to retaliate for the earlier drive-by shooting involving his relatives. Specifically, as the prosecution notes, evidence of defendant's involvement in the drug trade buttressed its retaliation theory by tending to show defendant needed to "get back" at the drive-by shooters to protect his "street credibility." Further, under the prosecution's theory, evidence that defendant was in fact a drug dealer holding a significant amount of cash undermines the defense's theory that defendant was an unsophisticated kid with no real criminal history who shot at the Mustang out of fear that the car's occupants would shoot him first. The prosecution was entitled to rely on the drug and other contraband evidence to make these legitimate points, both of which are relevant to whether defendant committed first degree murder or, as defense contended, a lesser included offense such as voluntary manslaughter. (Evid. Code, § 351 ["all relevant evidence is admissible"].)

Second, with respect to credibility, the contraband evidence weakens the defense theory that defendant honestly told the deputy district attorney that he shot at the Mustang in self defense because, in essence, he was too criminally unsophisticated to lie and to understand that the deputy district attorney represented law enforcement rather than his

30

own legal interests. As the prosecution notes, the fact that defendant may have been a drug dealer tends to prove the opposite ─ to wit, that he was a savvy criminal capable of duping law enforcement with respect to the facts underlying the shooting as well as his understanding of the criminal justice system, even in a lengthy custodial interrogation in the early morning hours following his arrest.

Thus, given the relevance of the challenged evidence when viewed in a light most favorable to affirming the judgment, we uphold the trial court's decision to admit it. (See *People v. Pelayo* (1999) 69 Cal.App.4th 115, 120-121 [on appeal, the court must consider the challenged evidence, and reasonable inferences that may be drawn from it, in a light most favorable to affirming the judgment].) Moreover, even if we were to assume for the sake of argument admission of the evidence was erroneous, there is no basis on this record for concluding defendant was thereby harmed.

## VI. Admission of State-of-Mind and Lay Opinion Testimony from Witnesses.

Next, we address defendant's challenges to the trial court's admission of certain live witness testimony at trial. First, defendant challenges the admission of testimony by Deputy District Attorney Leventis that she did not believe defendant when he told her after the interview that he had thought she was his attorney. In doing so, defendant contends Leventis's testimony was irrelevant speculation about defendant's beliefs that may have swayed the jury against his credibility. Second, he challenges testimony by two police officers, Souza and Bermudez, that some victims may not assist in police investigations because they prefer to personally retaliate against the perpetrators. With respect to both officers, defendant contends their testimony should have been excluded as irrelevant and as improper lay opinion testimony regarding the motivations of people unrelated to his case. We address each challenge in turn, ultimately concluding neither has merit.

### A. The District Attorney's State-of-Mind Testimony.

In opening statements, defense counsel told jurors defendant "actually thought mistakenly, and to no malfeasance or wrongdoing by the District Attorney's Office, this

31

was clearly a misunderstanding, that when he's talking to . . . Leventis from the District Attorney's Office he thinks he's talking to his lawyer." Defense counsel then theorized to jurors that defendant, believing Leventis was his attorney, honestly told her he shot the victims in the Mustang in self defense.

During trial, the prosecution thereafter called Leventis as a witness and, among other things, asked her about defendant's alleged mistaken belief that she was his attorney:

"PROSECUTION: Did the defendant tell you [at the end of the interview] that he had thought the whole time that you were on his side?

LEVENTIS: He did.

PROSECUTION: Now did you believe during your interview of the defendant that the defendant knew that you were from the D.A.'s office and not ─

DEFENSE: Objection. Speculation.

THE COURT: It's overruled.

LEVENTIS: I did believe that he knew I was from the D.A.'s Office.

[¶] . . . [¶]

PROSECUTION: And when the defendant told you at the end as you were leaving that he thought all along that you were on his side, did you think that he thought you were his attorney?

LEVENTIS: No.

DEFENSE: Same objection, your Honor. She can't testify as to what [defendant] was thinking.

THE COURT: Same ruling.

PROSECUTION: What were you thinking at that time?

LEVENTIS: My interview style is not very confrontational. I was very nice to him, including asking him if he was cold, had he had enough sleep, did he need water, things I would do with any person. And in a sense I thought that what he was thinking is well, I thought you were here to help me.

DEFENSE: Objection. Calls for speculation, your Honor.

32

THE COURT:  It's overruled.

LEVENTIS:  That I was there to help him because of the interview style but not there as his attorney.

PROSECUTION:  Maybe that you might put in a good word for him?

LEVENTIS:  Yes."

On appeal, defendant reiterates his objection to this testimony, raised several times below, that Leventis should not have been permitted to testify as to what defendant believed was her role in his case.  However, as defendant acknowledges (and as already discussed above), defense trial strategy was to argue that defendant's self defense excuse must be true because he told it to Leventis under the mistaken belief that she was his attorney.  Defense counsel also attempted to explain away the inconsistencies and omissions in defendant's version of events by arguing, more generally, that he "was subject to coercive tactics by police."  For example, defendant argues, because "the fact that [he] was truthful in his statement to Leventis was central to the defense case and because the trial court's ruling fatally undermined his theory, the ruling violates due process."  And, even on appeal, he argues that Leventis "clearly understood that appellant was mistaken about her identity as an adversarial attorney."  Under these circumstances, we decline to find error in the trial court's decision to permit Leventis to testify.  While the prosecution's questions were not phrased as artfully as they might have been, Leventis's testimony, fairly understood, did not purport to read defendant's mind but rather to describe the manner in which defendant projected his understanding during the interview, of Leventis's role with respect to his case.  As such, defendant's challenge to Leventis's testimony must fail.  (See also *People v. Cunningham* (2001) 25 Cal.4th 926, 1025 [prosecution is entitled to present evidence tending to contradict relevant defense evidence for impeachment].)

### B.    Officers Souza's and Bermudez's Testimony.

Officers Souza and Bermudez were questioned at trial by the prosecution regarding the failure by defendant and his friends and relatives to identify the Mustang as

the vehicle involved in the drive-by shooting at his uncle's home when questioned by police just after the crime. During this questioning, Officer Souza explained "[s]ometimes people are afraid to tell on suspects based on retaliation. Sometimes they want to handle the situation themselves, a form of retaliation." Officer Bermudez, in turn, testified that potential witnesses sometimes do not provide information to police because they "fear . . . retaliation," and sometimes because "they want to retaliate."

According to defendant, this testimony should have been excluded as irrelevant layperson opinion testimony. Specifically, defendant contends "opinion testimony about the motivation of individuals unrelated to the case" is not relevant because "the mens rea of other criminals in [his] community who did not report crimes to the police had no bearing on [his own] state of mind."

The prosecution, to the contrary, contends defendant opened the door to the officers' testimony by first eliciting testimony from Detective Phillips regarding "the culture of West Oakland." We agree with the prosecution.

As the record reflects, Detective Phillips was asked by defense counsel whether he has "learn[ed] a lot about the culture of West Oakland . . . in your general experience as an Oakland Police Department Officer." When the detective responded affirmatively, defense counsel asked whether, in West Oakland, "people tend not to come forward and talk or give the whole story" and whether it is "customary for people not to want to snitch." Detective Phillips responded "yes" to both questions.

Given this testimony for the defense, the trial court could reasonably have found the prosecution witnesses' opinion testimony was admissible because, one, it was based on both officers' direct observation of the behavior of potential witnesses to crimes in West Oakland and on Officer Bermudez's direct observation of defendant's behavior as a potential witness to the drive-by shooting at his uncle's house and, two, because it was helpful to explain other testimony in the record regarding defendant's failure to identify the Mustang as the vehicle involved in the earlier drive-by shooting and to support the prosecution's theory that he shot at the Mustang to retaliate for the earlier shooting. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1309 [lay opinion testimony is admissible

34

where "based on [the witnesses'] direct observation . . . and relevant to the charge"]; see also Evid. Code, § 800 [lay opinion testimony is admissible if "(a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony"].)

As the California Supreme Court has recognized, a party should not be permitted to "ask relevant questions, then, when the other side does not object, prevent all cross-examination (or redirect examination) responding to the same point by successfully asserting that its own question was improper. As noted, the matter lies within the discretion of the trial court, which should strive to prevent unfairness to either side when one side presents evidence on a point, then tries to prevent the other side from responding." (*People v. Steele* (2002) 27 Cal.4th 1230, 1248.)

## VII. Instruction of Jury on Imperfect Self Defense.

Defendant next argues the trial court committed reversible error by misinstructing the jury with respect to his imperfect self defense theory. "Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril. (*In re Christian S*. (1994) 7 Cal.4th 768, 773, 783 . . . .) When imperfect self-defense applies, it reduces a homicide from murder to voluntary manslaughter because the killing lacks malice aforethought. [Citations.]" (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.)

In this case, as discussed above, defendant theorized he fired his weapon at the Mustang out of fear that, if he did not, the Mustang occupants would fire first. To present this theory, defense counsel relied on defendant's extrajudicial statements in the record, without calling any witnesses. During trial, based on defendant's theory, the trial court gave the standard imperfect self defense instruction, CALJIC No. 5.17.[10] Defendant

---

[10] The challenged instruction was as follows: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought [and] is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary [or] [involuntary]

35

challenged the court's instruction on the ground that one component of it, the so-called "initial aggressor" clause, did not apply to his case. This clause stated as follows: "This principle [of imperfect self defense] is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's pursuit." According to defendant, this clause was improper because, by encompassing either "unlawful or wrongful conduct," it enabled the jury to reject his imperfect self defense theory based a finding that he committed any "wrongful" act, even a noncriminal one such as his decision to follow the Mustang in the first place. Defendant thus requested a pinpoint instruction to address this purported ambiguity, which defined "wrongful conduct" as the "willful initiation of a physical assault or the commission of a felony which presents the threat of physical harm to a third person." The trial court denied his request, prompting defendant to challenge both the instruction given and the pinpoint instruction not given.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551, 82 P.3d 755].) Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citations.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.].) 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Here, defendant's precise claim of error is this: "The inapplicable initial aggressor instruction, in conjunction with the erroneous refusal of the defense modification,

---

manslaughter. [¶] As used in this instruction, an 'imminent' peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the killer. [¶] However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's pursuit."

36

allowed the jurors to disregard the defense [imperfect self defense] theory so long as they believed [he] was engaged in 'wrongful conduct' which 'legally justified his adversary's pursuit.' [¶] The danger in the inapplicable initial aggressor instruction was that the jury would believe that [his] noncriminal but 'wrongful' decision to follow the Mustang in the first place – particularly while carrying a loaded firearm and perhaps in the company of others who possessed loaded firearms – disqualified [him] from later claiming imperfect self-defense when he later believed that he was being pursued." We vehemently disagree.

First, as a legal matter, defendant refers us to no authority, and we know of none, that so narrowly defines "wrongful conduct" for purposes of the imperfect self defense doctrine. As the prosecution notes, defendant's reliance on *In re Christian S., supra,* 7 Cal.4th 768 is misplaced. There, the California Supreme Court described the initial aggressor clause of the imperfect self defense doctrine as follows. "[T]he ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*Id*. at p. 773, fn. 1.) As this quoted language makes clear, the high court decision simply sets forth "initiation of a physical assault" and "commission of a felony" as two examples of conduct precluding a defendant from claiming imperfect self defense. The decision does not purport to state a rule limiting "wrongful conduct" for purposes of self defense to these two categories. Other California decisions are in accord, making clear the issue for purposes of imperfect self defense is whether the defendant acted in such a manner, whether unlawful *or* wrongful, that he created circumstances under which the victim was legally justified in attacking or pursuing the defendant (and thereby placing the defendant in actual fear of imminent harm). (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 761 [approving of instructions that "[t]he right of self-defense is not available to a person who seeks a quarrel with the

intent to create a real or apparent necessity of exercising self-defense," and that imperfect self-defense "is not available, and malice aforethought is not negated, if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which legally justified his adversary's use of force"]; *People v. Hardin* (2000) 85 Cal.App.4th 625, 634 [imperfect self-defense " 'is not available . . . if the defendant [intruder] by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force"].) As such, we reject defendant's attempt to more narrowly define the category of conduct that bars reliance on imperfect self-defense.[11] The jury instruction given in this case, CALJIC 5.17, was a correct statement of the law.

Second, as a factual matter, we question defendant's suggestion that the initial aggressor clause does not apply under the facts of his case. As defense counsel has argued, both here and below, " 'you don't know [in this case] who's chasing who' [because] the [Mustang and Cantres's truck] were 'passing each other in a chaotic and confusing situation' creating 'tension or fear' in appellant's mind." "Was it a chase, or was it cars interacting? Were they trying to get away at some point, or were they being pursued or were they pursuing?" What we do know is defendant and his friends believed the Mustang was involved in a drive-by shooting that injured his uncle and cousin, among others, and based on this belief, they were aggressively pursuing the Mustang in their truck with at least two deadly weapons. While defendant insists they pursued the Mustang only to get a license plate number, it was for the jury, not this court, to decide whether based on a totality of these circumstances defendant, "by his unlawful or wrongful conduct, created the circumstances which legally justified his adversary's [pursuit]." (*People v. Enraca, supra,* 53 Cal.4th at p. 761.)

## VIII. Cumulative Error.

Finally, in addition to arguing that each alleged error raised on appeal requires reversal, defendant argues the cumulative impact of the errors requires reversal because

---

[11]     In fact, the California Supreme Court has stated the imperfect self defense doctrine should itself be narrowly applied. (*In re Christian S., supra,* 7 Cal.4th at p. 773.)

the errors, considered together, cannot be proved harmless beyond a reasonable doubt. We disagree.  As we have seen, few errors, if any, were committed, and no error affected the verdict.  As such, no ground for reversal exists.  (*People v. Marshall* (1990) 50 Cal.3d 907, 945 [" ' " 'defendant is entitled to a fair trial but not a perfect one' " ' "].)

## DISPOSITION

We affirm.


_____

Jenkins, J.


We concur:


_____

Pollak, Acting P. J.


_____

Siggins, J.